**EXHIBIT A**

☐ IN THE COUNTY COURT OF THE 17TH JUDICIAL CIRCUIT
☒ IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT

| CIVIL DIVISION | **CIVIL ACTION SUMMONS**<br>**Personal Service on a Corporation** | CASE NUMBER |
|---|---|---|
| PLAINTIFF(S)<br><br>MICHAEL KEELER | VS. DEFENDANT(S)<br><br>EISAI, INC. | CLOCK IN<br>**1 0   2 0 5 3 8** |

| To Defendant(s):<br><br>EISAI, INC. by and through its Registered Agent<br>Corporation Service Company | Address:<br><br>1201 Hays Street<br>Tallahassee, Florida   32301 | Served<br>On  5-17-10  at 1:20P<br>Herman Mathers<br>Special Process Server #2<br>Leon County, Florida |
|---|---|---|

A lawsuit has been filed against you.   You have twenty (20) calendar days after this summons is served on you to file a written response to the attached complaint in this Court.   A phone call will not protect you: your written response, including the above case number and named parties, must be filed if you want this Court to hear your case.   If you do not file your response on time you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court.   There are other legal requirements.   You may want to call an attorney right away.   If you do not know an attorney, you may want to call a referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

Clerk of Courts
Broward County Courthouse
201 S.E. 6th Street
Fort Lauderdale, Florida   33301

You must mail or take a photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below:

| Plaintiff/Plaintiff Attorney:<br><br>SUSAN L. DOLIN, ESQ.<br>SUSAN L. DOLIN, P.A. | Address:<br>9000 Sheridan Street<br>Suite 93<br>Pembroke Pines, Florida   33024<br>Telephone:   954-862-2284<br>Facsimile:   954-862-2287<br>Email:   sdolin@dolinlawgroup.com |
|---|---|

TO EACH SHERIFF OF THE STATE OF FLORIDA: You are commanded to serve this Summons and a copy of the Complaint to this lawsuit on the above named defendant.

| CLERK OF COURTS<br>HOWARD C. FORMAN | Court<br>BY:<br>Seal<br>DEPUTY CLERK | TRESSA PARKER-RAY<br>A TRUE COPY<br>Circuit Court Seal | DATE<br><br>MAY 12 2010 |
|---|---|---|---|

F:\WPDOCS\~FORMS.ALL\GENLIT.ST\Summons\SUMMONS.17

## SUMMONS:   PERSONAL SERVICE ON A NATURAL PERSON

### IMPORTANT

A lawsuit has been filed against you.   You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court.   A phone call will not protect you.   Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case.   If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court.   There are other legal requirements.   You may want to call an attorney right away.   If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/ Plaintiff's Attorney" named below.

### IMPORTANTE

Usted ha sido demandado legalmente.   Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.   Una llamada telefonica no lo protegera.   Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.   Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.   Existen otros requisitos legales.   Si lo desea, puede usted consultar a un abogado inmediatamente.   Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuena, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

### IMPORTANTE

Des poursuites judiciares ont ete entreprises contre vous.   Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.   Un simple coup de telephone est insuffisant pour vous proteger.   Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.   Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.   Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.   Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**SUSAN L. DOLIN, P.A.**
*9000 Sheridan Street*
*Suite 93*
*Pembroke Pines, Florida 33024*
*Tel:   954-862-2284*
*Fax:   954-862-2287*
*Email:   sdolin@dolinlawgroup.com*

IN THE 17TH JUDICIAL CIRCUIT COURT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:    **10  20538**



MICHAEL KEELER,

    Plaintiff,

v.

EISAI, INC., a foreign
profit corporation,

    Defendant.

_____/



A TRUE COPY
MAY 12 2010
HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY FL

### COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, MICHAEL KEELER, by and through his undersigned counsel,

and sues the Defendant EISAI, INC., and for his cause of action declares and avers as follows:

1.    This is a claim in excess of $15,000, and thus jurisdiction is proper in this Court.

2.    The unlawful employment practices occurred in Broward County, and therefore

venue is properly laid in this Court.

3.    Plaintiff MICHAEL KEELER ("KEELER") is a citizen and resident of Broward County,

Florida, over the age of 18 years, and otherwise *sui juris*.

4.    At all times material hereto, Plaintiff KEELER was an employee of the Defendant,

EISAI, INC., within the meaning of §448.101(2), Fla. Stat.

5.    At all times material hereto, Defendant EISAI, INC. ("EISAI") was a foreign for

profit corporation engaged in the sale of pharmaceutical products including within the State of

Florida.  EISAI employed more than ten persons, including Plaintiff KEELER.  Therefore, at all

times material hereto, EISAI was an employer within the meaning of §448.101(3), Fla. Stat.

1

6.      At all times material hereto, EISAI employed KEELER as a sales representative, from 2006 until April 2009. KEELER was specifically employed to market and sell a cancer drug manufactured by EISAI called Ontak.

7.      Ontak is EISAI's trade name for the drug denileuken diflitox. Treatment with Ontak is indicated and has been approved by the United States Food and Drug Administration ("FDA") for use solely for the treatment of patients with persistent or recurrent cutaneous T-cell lymphoma ("CTCL") whose malignant cells express the CD-25 component of the IL-2 receptor.

8.      At the time EISAI acquired the rights to Ontak, it was aware that the sale of Ontak had been promoted by false and misleading information, as the FDA had sent a letter to the company from which EISAI bought the rights to the drug dated October 23, 2006, warning that its advertising was false and misleading.

9.      EISAI purchased the rights to Ontak on October 25, 2006, just two (2) days after the FDA issued its warning letter.

10.     At the time EISAI purchased the rights to Ontak, EISAI knew or should have known about the FDA's warning letter, as well as that Ontak was approved for use only for the treatment of patients with persistent or recurrent CTCL whose malignant cells express the CD-25 component of the IL-2 receptor.

11.     Virtually immediately upon its acquisition of the full rights to Ontak, EISAI continued to illegally market Ontak, for uses for which it was not indicated or approved by the FDA. Despite the FDA's warning letter, EISAI directed its sales force, including Plaintiff KEELER, to continue illegally marketing Ontak for treatment of cancers for which it had not been

2

approved by the FDA, such as ovarian cancer; melanoma; B-cell non-Hodgkin's lymphoma; peripheral T-cell ("PTCL") and other T-cell lymphomas; as well as Graft versus Host Disease ("GVHD"). At no time had or has Ontak been approved by the FDA to treat any of these cancers.

12.     Plaintff KEELER was in EISAI's first Ontak sales training class after it acquired the rights to Ontak, along with Heather Percey, Donna Weise, and Janice Evans. The meeting was held in November 2006, under the direction of EISAI Direction and Training Manager Darbi James. During that meeting, all the sales representatives who attended, including Plaintiff, were given training materials which included studies to be used in sales presentations to physicians. These studies were designed to promote the use of Ontak to treat diseases for which it was not indicated and for which it had not been approved by the FDA, such as follicular non-Hodgkin's lymphoma; chronic lymphocytic lymphoma; relapsed/refractory B-cell non-Hodgkin's lymphoma; adult T-cell leukemia lymphoma; peripheral T-cell lymphoma; GVHD; and melanoma.

13.     Ontak is a very strong and toxic cancer drug which is given to patients by intravenous infusion. It has significant adverse side effects, including the possibility of death, hospitalization and requirement of further medical treatment, which limit its use to only the most extreme cases. Special medical equipment is needed in close proximity while patients are being infused with Ontak, due to its significant side effects.

15.     Despite the fact that the FDA had approved Ontak only for use in patients with CTCL whose malignant cells express the CD-25 component of the IL-2 receptor, the FDA's warning letter reiterating same, and the extremely toxic nature of Ontak treatment, EISAI

3

management directed Plaintiff and others in its sales force to mislead physicians regarding the imperative presence of the CD-25 factor in patients with CTCL to be treated with Ontak. Rather, Defendant EISAI directed Plaintiff and the other salespersons to advise physicians that the CD-25 factor really had very little meaning to Ontak's response rate, which EISAI knew was not true. In fact, EISAI knew that the FDA had already stated that Ontak was indicated only for CTCL patients who expressed the CD-25 marker.

15.     EISAI provided Plaintiff and other sales representatives with numerous clinical studies which promoted various uses of Ontak for treatment of conditions for which it was not indicated and for which it had not received FDA approval, and directed the sales representatives, including Plaintiff, to use these studies during sales calls to physicians.

16.     For example, EISAI directed Plaintiff and other sales representatives to distribute, share and discuss these studies, which were outside the range of diseases or conditions for which treatment with Ontak was indicated and for which it had not been approved by the FDA. EISAI gave its Ontak salespeople product cards to provide to physicians during sales calls. The products cards showed the difference between the discounted price and what could be charged to third party payors (such as insurance companies, Medicare or Medicaid) for reimbursement for the non-indicated use of Ontak. This practice was referred to within EISAI as "marketing the spread." EISAI taught its sales force the intricacies of how to "market the spread" to encourage Ontak sales, even for use where it was not indicated or approved.

4

17.    EISAI also encouraged Plaintiff and others in the sales force to market Ontak to physicians with the lure of reimbursement directly by EISAI if in fact the physicians' patients' third payors refused to reimburse the physicians' use of Ontak for non-approved uses.

18.    EISAI also routinely provided grant funds and other resources to key teaching hospital administrators in order to obtain physicians to promote the use of Ontak in cases for which it was not indicated through presentations and speaking engagements.

19.    Many members of EISAI's support staff would make presentations to EISAI sales representatives, including Plaintiff, with updates on information and studies, events and the use of Ontak for various non-indicated purposes. The sales representatives, including Plaintiff, were expected to use these materials and information in their marketing and promotion of Ontak.

20.    EISAI sales representatives are evaluated based upon prior year's sales, and their new projected sales goals are as well.  These sales include a highly disproportionate percentage of Ontak sales for non-FDA-approved use.  Indeed, the only way that a sales representative could meet his or her sales quota was with sales of Ontak for conditions for which its use was not indicated, since sales for the only recognized and authorized use of Ontak was for such a limited and small population of patients.

21.    Sales representatives were rewarded for large numbers of sales of Ontak, including a large amount sold for non-indicated uses, with trips to resorts and other rewards. Many representatives were rewarded handsomely for Ontak sales outside of the indicated use, including but not limited to substantial bonuses for their selling of ONTAK for use outside the FDA approved indication.

5

22.     On numerous occasions, Plaintiff, along with other members of the Ontak sales force, complained frequently to management at meetings about being pressured to reach their sales quotas, as they contained a high percentage of Ontak sales for non-indicated use in treating conditions other than CTCL with a CD 25 factor, and the risks they were taking in doing so. Plaintiff was the most active in voicing such complaints. Not only were individual managers such as Randy Lawson, Brad Pierson, Heather Percy, and Larry Kristoff made aware of the serious nature of the problem, senior management such as David Trexler, Steve Vickers, Keith Woods and Leslie Mirani were fully aware of the selling of ONTAK for use outside of the FDA approved conditions. Vickers, Kristoff and Lawson all promised to look into Plaintiff's complaints and changing the compensation structure such that it would not encompass sales of Ontak for non-indicated uses, but nobody ever got back to Plaintiff and the compensation structure never changed.

23.     In approximately August 2008, Leslie Mirani was hired as a new Director for the Oncology Division. Plaintiff and other salespersons made Mirani aware of the problem of sales of Ontak for non-indicated use. Ms. Mirani called a meeting in Boston in October 2008. In attendance at this meeting were sales representatives Plaintiff, Shirley Delung Hill, Chris Johnson, Tom Hillsberg, Ann Spect and Doug King. The main issuea discussed were: 1) stopping the sales of Ontak for use outside the FDA aproved uses; the exclusion of sales of Ontak for use outside the FDA's approved indication in calculations of bonuses and sales goals; and 3) changing the commission plan so that lower sales of Ontak for non-indicated use would not be counted against the sales force. Plaintiff KEELER was the leader of the group in trying to create the changes, and provided documentation and voiced facts specific to his territory. Many of

6

the other sales representatives also described situations specific to them where their compensation had been affected by sales of Ontak for non-indicated uses.

24.     Mirani hired Keith Woods as the Director of Lymphoma at EISAI in October or November 2008. At a meeting with Plaintiff in January 2009, Woods criticized Plaintiff about some time off which Plaintiff had taken for a death in the family and discussed with Plaintiff about Plaintiff's not being a "team player." Nevertheless, Woods attempted to enlist Plaintiff's help to "quietly" coach his teammates on how to sell Ontak for non-indicated uses in order to meet very aggressive corporate sales goals.

25.     In March 2009, at a meeting in Ft. Lauderdale, Florida, Plaintiff warned a new sales representative, Barbara Rayburn, about the high rate of use of Ontak for the non-FDA approved treatment of melanoma at the University of Louisville, and the difficulty she might possibly have in achieving her sales goals because of it. Several other representatives, including Donna Weise, Mark Rosser and Brian Cullins also told her to be careful. Barbara Rayburn became concerned about these warnings and went to her District Manager, Randy Lawson, as well as Keith Woods. She was completely unaware when EISAI hired her of the high volume of Ontak sales for non-approved use in her territory.

26.     Directly following Plaintiff's warning to Rayburn, at an April 2009 meeting in Ft. Lauderdale, Florida, Keith Woods discussed in detail a planned "ride-along" which Plaintiff had scheduled with his direct supervisor, District Manager Randy Lawson, and Woods directed Lawson to criticize Plaintiff's performance and give him a bad field report on the "ride-along", even though Plaintiff's performance was excellent. Woods again further stated that Plaintiff was not a "team player." Prior to this time, and even at the time he received the poor field

7

report, Plaintiff was a top performer with high sales numbers, and was in fact the number two Ontak salesperson in the whole company, with some 60% of his sales being for non-FDA approved use.

27.    During the week of April 17, 2009, Plaintiff received a call from Ken Pina, outside counsel for EISAI. Pina asked Plaintiff about the situation regarding the University of Louisville's large volume of Ontak use for non-indicated purposes and its participation in the PAR/OCP program.  Plaintiff told Pina that he was not the sales representative for that territory and advised him to contact either Barbara Rayburn or that territory's former sales representative, Archie Franklin.  In the interim, EISAI's District Manager, Randy Lawson, who was supposed to do Plaintiff's performance review, quit.

28.    On April 24, 2009, Keith Woods terminated Plaintiff's employment, stating that Plaintiff "didn't live the EISAI values."  Woods also told Plaintiff that one of the reasons for his termination was his warning to Barbara Rayburn about the promotion and sale of Ontak for use outside the FDA approved indications.

## COUNT I—RETALIATION AGAINST PLAINTFF IN VIOLATION OF THE FLORIDA WHISTLEBLOWER'S PROTECTION ACT

29.    Plaintiff incorporates as if fully set forth herein paragraph 1-28 of the within Complaint.

30.    By and through its above-referenced conduct, Defendant EISAI was violating several federal laws, including but not limited to the Veterans' Health Care Act of 1992, 42 U.S.C. §340(B) and the False Claims Act, 31 U.S.C. § 3729(a)(3), by marketing and selling Ontak for use by physicians in patients for whom the drug was neither indicated nor approved by the

8

FDA, and receiving reimbursement or aiding and abetting or causing others to receive reimbursement from government health care programs for the improper use of Ontak.

31.     Plaintiff KEELER, by and thorough his complaints and objections to Defendant EISAI's violations of federal statutes, engaged in protected activity pursuant to §448.102(3), Fla. Stat.

32.     By and through its adverse employment actions taken against KEELER, including but not limited to terminating KEELER's employment because of KEELER's objections to EISAI's unlawful activities, EISAI has violated KEELER's rights pursuant to §448.102(3), Fla. Stat.

33.     As a direct and proximate result of EISAI's unlawful actions, KEELER has suffered damages.

WHEREFORE, Plaintiff MICHAEL KEELER demands judgment against Defendant EISAI, INC., as follows:

A.     Injunctive relief prohibiting the Defendant from further engaging in unlawful conduct under the Florida Whistleblowers' Protection Act, §448.01 *et seq*. Fla. Stat.

B.     Reinstatement to his former position or a substantially equivalent position with the same benefits and compensation;

C.     Full backpay including lost wages and fringe benefits, other remuneration and seniority rights;

D.     Compensatory damages; and

E.     Attorneys' fees and costs of litigation.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

SUSAN L. DOLIN, P.A.
9000 Sheridan Street
Suite 93
Pembroke Pines, FL 33024
Tel.: 954-862-2284
Fax: 954-862-2287
Email: sdolin@dolinlawgroup.com

By: _____

SUSAN L. DOLIN, ESQ., BCS
FBN: 708690

10

IN THE 17TH JUDICIAL CIRCUIT COURT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:

MICHAEL KEELER,

      Plaintiff,

v.

EISAI, INC., a foreign
profit corporation,

      Defendant.

_____/



**PLAINTIFF MICHAEL KEELER'S NOTICE OF SERVING FIRST SET OF INTERROGATORIES TO DEFENDANT**

    Plaintiff, by and through his undersigned attorneys, hereby gives notice of serving his First Set

of Interrogatories, numbered 1-19, with the Complaint and Summons upon the Defendant, EISAI, INC. in

accordance with Fla. R. Civ. P. 1.340, to be responded to within 45 days of the date of service.

                    SUSAN L. DOLIN, P.A.
                    9000 Sheridan Street
                    Suite 93
                    Pembroke Pines, FL 33024
                    Tel.: 954-862-2284
                    Fax: 954-862-2287
                    Email: sdolin@dolinlawgroup.com

                    By: _____
                    SUSAN L. DOLIN, ESQ., BCS
                      FBN: 708690

IN THE 17TH JUDICIAL CIRCUIT COURT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:

MICHAEL KEELER,

    Plaintiff,

v.

EISAI, INC., a foreign
profit corporation,

    Defendant.

_____/



**10   20538**

A TRUE COPY

MAY 12 2010

HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY, FL

### PLAINTIFF MICHAEL KEELER'S FIRST SET OF INTERROGATORIES TO DEFENDANT

Plaintiff, by and through *his* undersigned attorneys, requests that Defendant answer, through

its managing agents and employees, under oath, in accordance with Fla. R. Civ. P. 1.340, the following

interrogatories numbered 1- 19 within 45 days of the date of service.

SUSAN L. DOLIN, P.A.
9000 Sheridan Street
Suite 93
Pembroke Pines, FL 33024
Tel.: 954-862-2284
Fax: 954-862-2287
Email: sdolin@dolinlawgroup.com

By: _____

SUSAN L. DOLIN, ESQ., BCS
FBN: 708690

## INSTRUCTIONS FOR ANSWERING

a)   Please note that all answers are to be made separately and fully and that an incomplete or evasive answer is a failure to answer. Where an interrogatory calls for an answer in more than one part, please separate the parts in your answer accordingly so that each part is clearly set out and understandable.

b)   Where your knowledge or information in your possession is requested, such request includes knowledge or information in possession of your representatives, employees, agents, independent contractors, insurers, and, unless privileged, your attorneys.

c)   If you have only incomplete knowledge of the answer to an interrogatory, please answer to the extent of your knowledge and state specifically what part or area of the Interrogatory you have only incomplete knowledge of and identify the person(s) who does or might have additional knowledge or information to complete the answer.

d)   You may answer any interrogatory in whole or in part by attaching a document(s) which contains information sufficient to do so. Such document(s) may, if authenticated, be a copy of the original. Any document(s) used to answer an interrogatory may contain other information as well; however, the relevant portion of that document(s) must be so marked or indexed.

e)   The term "document(s)" refers to all writings of any kind, including the originals and all nonidentical copies, whether different from the original by reason of any notation made on such copies or otherwise, including without limitation correspondence; memoranda; notes; diaries; statistics; letters; materials; invoices; orders; directives; interviews; telegrams; minutes; reports; studies; statements; transcripts; summaries; pamphlets; books; interoffice and intraoffice communications; notations of any sort of conversations, telephone calls, meetings or other communications; bulletins; printed matter; teletype; telefax; computer hard drives ("ESE"), e-mails, worksheets; and all drafts, alterations, modifications, changes and amendments of any of the foregoing; graphic or aural recordings or representations of any kind, including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, records, motion pictures; and electronic, mechanical, or electrical recordings or representations of any kind, including without limitation, tapes, cassettes, cartridges, discs, chips, and records.

f)   Where the identity of a person is requested, please state his or her full name; any known nickname and aliases; age; social security number; present or last known home address and telephone number; present or last known position and business affiliation or employment and the address and telephone number there; and his or her employment and position at the time in question. For persons whose addresses are known to be inaccurate at this time, please state the most reliable contact address and contact person in your records.

g)      Where a statement or description is requested, please include a specific account of what is being stated or described, including where applicable, without limitation, the date or time period involved; the identity of person(s) from whom the information was learned, who would have knowledge of that information, and/or who participated or were present; what happened in chronological order relating each identifiable event, response, act, or other thing; where by address and, if known, ownership and use, the occurrence took place; the context or circumstances in which the occurrence took place; and what response or reaction existed to cause the occurrence to take place and/or was made after the occurrence took place.

h)      Unless otherwise indicated, the time period each interrogatory refers to is that of the occurrences described or referred to in the Complaint and any amendments thereto.

i)      For each interrogatory, please identify the person(s) from whom the information contained in the answer is obtained and the person(s) who swear to the truth of that information.

j).     The term "Defendant," "you," "your," "yours," or "you're" refers to the Defendant EISAI, INC.

k).     The term "Plaintiff" means MICHAEL KEELER.

## INTERROGATORIES

1.      Please state the name, address and telephone number of each person who participated in, or contributed to, answering these interrogatories.

2.   Please identify persons who have knowledge of the following:

    i)   Plaintiff's job performance and ability to fill the position of sales representative;

    ii)   operation or application of any personnel handbook and Defendant's practices regarding orientation, discipline, job evaluation, promotion, layoffs, and discharges;

    iii)   meetings, conferences, or discussions among EISAI management where Plaintiff's internal complaints about marketing Ontak for non-FDA approved uses were discussed;

    iv)   Keeler's job performance, and/or termination were discussed;

    v)   the salary, including fringe benefits, received by Plaintiff at the time of his termination from Defendant's employ;

    vi)   the job performance of Plaintiff's supervisors, including but not limited to Leslie Marani ; Randy Lawson; Brad Pierson; Heather Percy; Larry Kristoff; David Trexler; Steve Vickers; and Keith Woods.

    vii)   complaints by other sales representatives about the marketing of Ontak for non-FDA approved uses, including but not limited to Barbara Rayburn, Donna Weise, Mark Rosser, Janice Evans and Brian Cullins

viii).   the names of witnesses with knowledge or information relevant to the subject matter of this action, including addresses if known, and the nature and substance of <u>each</u> witness' knowledge;

ix.   the existence, custodian, location, and general description of documents which reflect or relate to the allegations of Plaintiff's complaint.

3.   For each person identified in answer to Interrogatory No. 2, please state and describe what contact Defendant, through its management, representatives, employees, agents, independent contractors, insurers and/or attorneys has had with him or her pertaining to this lawsuit, and whether any written statements were obtained.

4.  Please identify any experts who have knowledge secured in the course of their consultation with Defendant of Plaintiff and/or potential liability for violation of Plaintiff's rights under the Florida Whistleblower Protection Act.

5.  Please state and describe each and every ground relied upon, known, and/or heard by Defendant to indicate or demonstrate that Plaintiff did not merit retention the sales representative or that his performance level was incompetent.

6.  Please identify and list each sales representative employed by Defendant since Plaintiff's termination, and provide his or her salary, benefits, any anticipated increases in salary and current employment status each such employee.

7.   Please describe the table of organization or hierarchy for EISAI, INC. and identify each person filling those positions at any time during Plaintiff's employment.

8.   Please state and describe the employment practices and policies related to assignment, promotion, evaluation, discipline, discharge, and compensation of sales representatives.

9.   Please state whether Defendant has acquired any evidence since Plaintiff's termination that Plaintiff would merit being terminated even if she had not been terminated previously.

10. Please describe every charge and/or lawsuit brought against Defendant alleging that the Plaintiff had complained about the violation of a law, rule or regulation and been retaliated against as a result of such complaint, indicating for each such suit the forum, the case or docket number, status, resolution, and contents, and please identify for each the person bringing the charge and/or lawsuit.

11. Please describe each conversation Plaintiff had with his supervisors and/or they had with Plaintiff that pertained to the violation by Defendant of a law, rule or regulation.

12. Please describe each conversation that any sales representative had with his or her supervisors and/or they had with the sales representatives that pertained to the violation by Defendant of a law, rule or regulation, including but not limited to Shirley Delung Hill, Chris Johnson, Tom Hillsberg, Ann Spect, Doug King and Plaintiff.

13.   Please describe in detail all of the sales materials which were given to sales representatives to market Ontak.

14.   Please state all of the doctors' names, addresses and telephone numbers to whom EISAI, INC. gave funds or grants in exchange for the promotion of Ontak for non-FDA approved uses.

15.   Please state all bonuses and extra compensation, including but not limited to, non-monetary compensation such as vacations and trips, paid to sales representative for Ontak sales.

16.   Please state the names, addresses and telephone numbers of all sales representatives who sold Ontak from the date EISAI, INC. acquired the rights to Ontak to present.

17. Please state the nature and type of training classes held for sales representatives who sold Ontak, including the dates of such classes, the materials used therein, and the content of the discussions; the date each such training class was held; who was in attendance at each training class, and who taught each such training class.

18. Please state EISAI, INC.'s gross revenues from the sales of Ontak for FDA-approved and non-FDA approved uses for each year since EISAI, INC. obtained the rights to Ontak.

19. Please state each and every reason for your termination of Plaintiff's employment, and state all documents which support each such reason.

I hereby swear or affirm that the foregoing answers to interrogatories are true and correct under penalty of perjury.

_____

NAME

_____

PRINT NAME

_____

TITLE

BEFORE ME , the undersigned authority, came the above-named individual, who is personally known to me or produced identification in the form of _____, and swore or affirmed to the truth of the above-stated Answers to Plaintiff's First Set of Interrogatories.

_____

NOTARY PUBLIC

_____

PRINT NAME

MY COMMISSION EXPIRES:

IN THE 17TH JUDICIAL CIRCUIT COURT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:                **10   20538**   **02**

MICHAEL KEELER,

    Plaintiff,

v.

EISAI, INC., a foreign
profit corporation,

    Defendant.



A TRUE COPY
MAY 1 2 2010
HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY, FL

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION**

COMES NOW the Plaintiff, MICHAEL KEELER, by and through his undersigned counsel,

and pursuant to Fla. R. Civ. P. 1.350, hereby propounds her First Request for Production upon

the Defendant, EISAI, INC. as follows:

## INSTRUCTIONS FOR ANSWERING

A.    As used herein, the terms "Defendant", "you" or "your" mean EISAI, INC.

including its divisions, departments, subsidiaries, affiliates, predecessors, present or former

officers, owners, agents, attorneys, employees and all other persons acting or purporting to act

on its behalf, as well as each partnership in which it is a partner.

B.    As used herein, the terms "Plaintiffs" and/or "Plaintiff", mean MICHAEL KEELER.

C.    As used herein, the term "Complaint" means that Complaint filed by Plaintiff in

the 17h Judicial Circuit Court in and for Broward County Florida.

D.      As used herein, the terms "person", "individual", or "entity" mean any natural person, individual, proprietorship, partnership, corporation, association, organization, joint venture, firm, other business enterprise, governmental body, group of natural persons or other entity.

E.      As used herein, the term "document" means all written and graphic matter, however produced or reproduced, and each and every thing from which information can be processed, transcribed, transmitted, restored, recorded, or memorialized in any way, by any means, regardless of technology or form.  It includes, without limitation, correspondence, memoranda, notes, notations, diaries, papers, books, accounts, newspaper and magazine articles, photographs, notebooks, ledgers, letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements, reports, objects, tangible things, work papers, transcripts, minutes, reports and recordings of telephone or other conversations or communications, or of interviews or conferences, or of other meetings, occurrences or transactions, affidavits, statements, summaries, opinions, tests, experiments, analysis, evaluations, journals, balance sheets, income statements, statistical records, desk calendars, appointment books, lists, tabulations, sound recordings, data processing input or output, microfilms, checks, statements, receipts, summaries, computer printouts, computer programs, information kept in computer hard drive ("ESE"), computer tape back-up, CD-ROM, computer floppy diskettes, teletypes, telecopies, invoices, worksheets, printed matter of every kind and description, graphic and oral records and representations of any kind, and electronic and mechanical records and representations of any kind is not deemed to be identical with one without such marks and is to be listed as a separate document.  Where there is any question about whether a tangible item

otherwise described in these requests falls within the definition of "document" such tangible item shall be listed.

F.    As used herein, the phrase "all documents" means every document or group of documents or communication as defined herein that are known to you or that can be located or discovered by reasonably diligent efforts.

G.    As used herein, the term "agreements" shall mean agreements, contracts, arrangements, mutual promises, accords, engagements or undertakings.

H.    As used herein, the term "communications" shall mean any oral or written statement, dialogue, colloquy, discussion, conversation, or direct or indirect representation and, also, means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to another by electronic or similar means.

I.    As used herein, the term "all communications" means each and every communication as above-defined that is known to you or about which you have any information.

J.    As used herein, the term "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

K.     As used herein, the term "any" shall be understood to include and encompass "all" and vice versa.

L.     All words in the present tense include the past tense and all words In the past tense include the present tense.

M.     As used herein, the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

N.     As used herein, the term "relate to" or "relating to" means in any way, directly or indirectly concern, reflect, refer to, constitute, contain, evidence, analyze, memorialize, discuss, show, amend, confirm, endorse, represent, support, qualify, describe, terminate, revoke, pertain to, comment on, negate or relate to or connect in any way, logically or factually, with the matter described in this request.

## REQUESTS

1.     All documents identified in Defendant's Answers to Plaintiff's First Set of Interrogatories.

2.     All documents related in any way to Plaintiff's employment and/or separation from employment with Defendant.

3.     All documents concerning each evaluation, appraisal, commendation, comment, criticism, discipline or reprimand by the Defendant of Plaintiff's work performance from the date of Plaintiff's employment with such Defendant until Plaintiff's termination of employment from Defendant.

4.     All documents concerning the wages and other forms of compensation or benefits which Plaintiff has received from the Defendant.

5.    All documents concerning any meeting or other communication between Plaintiff and each person whom Defendant believes possesses knowledge of the relevant facts and circumstances, or the allegations, claims and defenses involved in this litigation.

6.    All documents concerning any communications, interactions or relations between the Defendant and Plaintiff.

7.    All written statements made by any witness to the events alleged or claims asserted by Plaintiff in his Complaint or the defenses asserted or to be asserted by Defendant.

8.    All documents concerning any statements, written or oral, made by any witnesses to the events alleged or claims asserted by Plaintiff in his Complaint or the defenses to be asserted by Defendant.

9.    All physical evidence related to or concerning any of Plaintiff's claims or to any defense to be asserted by the Defendant.

10.    All policies and procedures relating to any misconduct in which Defendant claims Plaintiff engaged.

11.    All documents provided to Plaintiff during the term of his employment including, but not limited to, employment contracts, policy and procedures manuals, sales policies, sales manuals, sales promotional materials including but not limited to "flashcards," studies and details of any internal reimbursement plan for purchasers of Ontak, including but not limited to the Ontak Assistance Program and Ontak Credit Program.

12.    All documents related to or concerning any current or former employee(s) of Defendant who complained about or objected to the sale of Ontak for treatment of conditions or diseases for which the FDA had not approved such treatment.

14.    All documents concerning or relating to any lawsuits brought against Defendant by employees or former employees claiming that they were retaliated against based upon their complaints or objections to the sale of Ontak for treatment of conditions or diseases for which the FDA had not approved such treatment

15.    All documents which support Defendant's or Defendant reasons for terminating Plaintiff's employment.

16.    All documents concerning or related to the termination of Plaintiff's employment with Defendant.

17.    All documents concerning or related to the person or persons who replaced Plaintiff in the position he held while employed with the Defendant.

18. All documents concerning or relating to Plaintiff's complaints about or objections to Defendant's basing Plaintiff's and other salespersons' compensation in whole or in part upon their sale of Ontak for non-indicated uses or non-FDA approved uses.

19. All documents concerning or relating to Defendant's employment, either prior or currently, of persons who claimed or are currently claiming that they were retaliated against based upon their complaints or objections to the sale of Ontak for treatment of conditions or diseases for which the FDA had not approved such treatment.

20. All documents concerning or relating to salespersons' other than Plaintiff, complaints about or objections to Defendant's basing Plaintiff's and other salespersons' compensation in whole or in part upon their sale of Ontak for non-indicated uses or non-FDA approved uses.

21. All documents related to, referencing or concerning financial agreements; consulting agreements; financial payments; expense reimbursements, including but not limited to, for airfare, meals, attendance at conferences, lectures, speaker programs, ride alongs with EISAI salespeople or meetings, involving Eisai and/or the sale of Ontak, with or to Dr. Nam Dang; Dr. Francine Foss, and Dr. Jason Chesney from the time Eisai acquired the rights to Ontak to the present.

22. All documents related to, referencing or concerning financial agreements; consulting agreements; financial payments; expense reimbursements, including but not limited to, for airfare, meals, attendance at conferences, lectures, speaker programs, ride alongs with Eisai salespeople or meetings, involving Eisai and/or the sale of Ontak, with or to any other physicians from the time Eisai acquired the rights to Ontak to the present.

23. Expense reports for Marketing personnel including but not limited to: David Trexler, Diana Bodden, Mark Acosta, Pharm D, Sreenasvas Rao, Kiernan or Kieran LAST NAME UNKNOWN, Clanton Carter, Keith Woods, Leslie Mirani, Archie Franklin, Heather Percy, Larry  Kristoff, Brad Pierson, and Barbara Rayburn from the time Eisai acquired the rights to Ontak to the present.

24. All payments paid to physicians during ASCO, ASH, NCCN and other conferences and Ad Boards held at such conferences, including but not limited to the Pan Pacific Lymphoma conference in 2007, where the use of treatment with Ontak was discussed, including but not limited to hotel expenses, meal expenses, travel expenses and research grants paid or awarded from the time Eisai acquired the rights to Ontak to the present.

25. All documents related to, referencing, or utilized at the conferences and Ad Boards referenced in Request Number 24 to market and/or promote the use of Ontak.

26. Call reports for all Eisai sales representatives who sold Ontak from October 2006 to present showing the dates of the sales calls and the accounts visited, including the "drop down" box which reflects the main selling points of the drugs that were discussed, including but not limited to durable response, minimal immunosuppression, and other marketable qualities.

27. Any and all payments to the University of Arizona, including but not limited to Dr. Miller, for preceptorships held in 2007, including but not limited to travel and subsistence expenses for all participants .

28. All documents related to the preceptorships at the University of Arizona and/or involving Dr. Miller, including to any treatments of patients with Ontak, the reasons for such treatments, the conditions for which the patients were being treated, any research studies generated as a result of such preceptorships, and all revenues, if any, realized by Eisai as a result of such preceptorships

29. All documents reflecting, referring or related to educational grants paid by Eisai to physicians for Eisai's lymphoma group, including but not limited to the dates and amounts of such grants, the names of the physicians, institutions or universities to whom or which such grants were issued, the purposes for which such grants were issued, and any research studies which were generated from such grants from the date Eisai acquired the rights to Ontak to the present.

30. All documents reflecting, referring or related to any purchasers of Ontak who participated in and the terms and results of such participation in the Ontak Assistance Program and Ontak Credit Program, including but not limited to the purchaser's use of Ontak, reimbursements to the purchaser for the purchase of the Ontak, and any monetary or other benefits realized by Eisai from such participation

31. All payments for grants or subsidies of research studies to MD Anderson Medical Center, Yale University, Nevada Cancer Institute, MSK, Dana Farber Cancer Center, Northwestern University, Roswell Park Institute, Ohio State University Cancer Center, University of Washington, UCLA, Moffitt Cancer Center, Mayo Clinic, Emory University, Duke University, University of North Carolina and the University of Louisville.

32. All documents reflecting, referring or relating to compensation plans for Eisai salespersons, including but not limited to Plaintiff, from the time Eisai acquired the

rights to Ontak until the present, including but not limited to, commission structure, incentive plans and bonus plans.

33.   All documents reflecting, referring or relating to Eisai management's establishment or implementation of sales forecasting, quotas, goals and sales objectives for Eisai salespersons, including but not limited to Plaintiff, from the time Eisai acquired the rights to Ontak until the present.

34.   All documents reflecting, referring or relating to compensation actually paid to its sales representatives, including but not limited to Plaintiff, from the time Eisai acquired the rights to Ontak until the present.

35.   All documents reflecting, referring or relating to Eisai's hire of consultants, including but not limited to McKenzie, in any way, manner or fashion connected to the sale of Ontak from July 2008 to the present including, but not limited to, the date(s) of hire, the consultant's name and qualifications/background, current address and telephone number, and any communications between Eisai and such consultants and reports or studies generated by such consultants.

36.   Personnel Files of Kim Harris, Randy Lawson, Heather Percy, Frank LAST NAME UNKNOWN (new West Region District Manager, Steve Vickers and Larry Kristoff.

37.   All documents reflecting, referring or in relating to complaints made to Robert Fogelman about Leslie Mirani, Keith Woods, Randy Lawson, Heather Percy, Brad Pierson, Steve Vickers and/or the new West Region District Manager Frank LAST NAME UNKNOWN and any action taken by Eisai as a result of such complaints.

38.   All documents, including but not limited to notes, memoranda or other documents generated by Robert Fogelman and Leslie Mirani following or during a meeting in Boston, Massachusetts in October 2008.

39.   All completed OAR forms by physicians, cancer centers, hospitals, infusion centers, or any health care provider from the time Eisai acquired the rights to Ontak to the present.

40.   All documentation reflecting, referring or relating to compensation or reimbursement claims worked on by John Schillo or any other individual regarding the OAR/OCP "Ontak Credit Program or Ontak Assistance Reimbursement Program.

41.   All documents reflecting, referring or relating to trips or travel or vacations awarded to Eisai sales personnel including, but not limited to, the named of all such sales personnel who received such awards, the basis for such awards, and the cost of such awards, from the time Eisai acquired the rights to Ontak to the present.

42.   All documents reflecting, referring or relating to trips or travel or vacations awarded to Eisai divisional/regional personnel including, but not limited to, the named of all such divisional/regional personnel who received such awards, the basis for such awards, and the cost of such awards, from the time Eisai acquired the rights to Ontak to the present.

43.   All documents reflecting, referring or relating to al fees paid by Eisai to physicians for studies, case reports, publications, books, study manuals, and protocols, including but not limited to the subject matter and nature of such studies, case reports, publications, books, study manuals, and protocols, relating to or implicating Ontak or its use.

44.   All documents reflecting, referring or relating to any calls to Eisai's reimbursement hotline.

45.   All documents reflecting, referring or relating to reports of serious toxicity complications of Ontak made to Eisai's medical hotline.

46.   All documents reflecting, referring or relating to adverse events reported to the Eisai or the FDA regarding or applying to ONTAK.

47.   All documents reflecting, referring or relating to contracts for research funding for or regarding Ontak, including but not limited to the nature of the research, amounts or fees paid for such research, recipients of such funding, dates of such payments, and result of such contracts including final outcome of research, if any, and clinical studies generated as a result.

48.   All documents reflecting, referring or relating to costs associated with marketing promotions for field personnel, including by of example but not limitation, "lunch and learn" programs or dinners from the time Eisai acquired the rights to Ontak to the present.

49.   All documents reflecting, referring or relating to annual budgets of the Eisai marketing department and the actual amount spent from the time Eisai acquired the rights to Ontak to the present.

50.   All documents reflecting, referring or relating to the annual budgets for each sales representative, manager, and upper management for marketing and promotional efforts and actual amounts spent by each from the time Eisai acquired the rights to Ontak to the present.

51.   All documents reflecting, referring or relating to the retention or destruction of marketing materials from the time Eisai acquired the rights to Ontak to the present.

52.  All documents reflecting, referring or relating to FDA communications to Eisai or any entity or individual which or who owned the rights to Ontak regarding approval, revisions, destruction of marketing materials, warnings of promotional wrongdoings, and/or warnings of the use of unapproved promotional materials regarding or relating to Ontak.

53.  All documents reflecting, referring or relating to pricing, discounts, or rebates to wholesalers, relating to or implicating Ontak.

54.  All documents reflecting, referring or relating to communications by Eisai Human Resources or Management from or to any individual, including but not limited to Randy Lawson, Heather Percy and/or Brad Pierson, concerning infractions or violations of Eisai policy or procedure, or external laws, rules or regulations from the time Eisai acquired the rights to Ontak to the present.

55.  All documents reflecting, referring or relating to consulting agreements   between Eisai and oncology nurses, pharmacists, support staff, research nurses, and/or assistants, and payments made to such oncology nurses, pharmacists, support staff, research nurses, and/or assistants by Eisai, from the time Eisai acquired the rights to Ontak to the present.

56.  All documents reflecting, referring or relating to medical inquiries by field representatives from October 2006 to the present

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served with the Complaint upon Corporation Service Company, Registered Agent for the Defendant, at 1201 Hays Street, Tallahassee, Florida 32301.

SUSAN L. DOLIN, P.A.
9000 Sheridan Street
Suite 93
Pembroke Pines, FL  33024
Tel.: 954-862-2284
Fax: 954-862-2287
Email: sdolin@dolinlawgroup.com

By: _____

SUSAN L. DOLIN, ESQ., BCS
FBN: 708690

IN THE 17TH JUDICIAL CIRCUIT COURT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:

**10   20538**

**02**

MICHAEL KEELER,

　　　Plaintiff,

v.

EISAI, INC., a foreign
profit corporation,

　　　Defendant.

_____/

A TRUE COPY

MAY 1 2 2010

HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY, FL

## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

COMES NOW the Plaintiff, MICHAEL KEELER, by and through his undersigned counsel,

and, pursuant to Rule 1.370 of the Fla.R.Civ.P., requests that the Defendant EISAI, INC. admit

the truth of the following matters for the purpose of this action only and subject to all pertinent

objections to admissibility which may be interposed at trial, and serve its response thereto

upon the undersigned attorney within the time allowed, and in the manner prescribed under

the Florida Rules of Civil Procedure:

　　　1.　　　Admit that at the time EISAI, INC. acquired the rights to the drug Ontak, it was

aware that the United States Food and Drug Administration ("FDA") had approved Ontak for

use solely for the treatment of patients with persistent or recurrent cutaneous T-cell lymphoma

("CTCL") whose malignant cells express the CD-25 component o the IL-2 receptor.

　　　2.　　　Admit that at the time EISAI, INC. acquired the rights to Ontak, it was aware that

the FDA had notified the entity from which EISAI, INC. acquired those rights warning that its

advertising of Ontak was false and misleading.

3.    Admit that at the time EISAI, INC. acquired the rights to Ontak, it was aware that the FDA had notified the entity from which EISAI, INC. acquired those rights warning that its marketing of Ontak was false and misleading.

4.    Admit that at the time EISAI, INC. acquired the rights to Ontak, it was aware that the entity from which it acquired those rights was utilizing false advertising to market Ontak.

5.    Admit that at the time EISAI, INC. acquired the rights to Ontak, it was aware that the entity from which it acquired those rights was utilizing misleading advertising to market Ontak.

6.    Admit that EISAI, INC. marketed Ontak for non-FDA approved uses.

7.    Admit that EISAI, INC. advertised Ontak for non-FDA approved uses.

8.    Admit that EISAI, INC. directed its sales force to market Ontak for non-FDA approved uses.

9.    Admit that EISAI, INC. directed its sales force to advertise Ontak for non-FDA approved uses.

10.    Admit that EISAI, INC. directed its sales force to market Ontak for non-FDA approved uses.

11.    Admit that EISAI, INC. based its sales force's commissions in whole on their sales of Ontak for non-FDA approved uses.

12.    Admit that EISAI, INC. based its sales force's commissions in part on their sales of Ontak for non-FDA approved uses.

13.    Admit that EISAI, INC. based Plaintiff's commissions in whole on his sales of

2

Ontak for non-FDA approved uses.

14.    Admit that EISAI, INC. based Plaintiff's commissions in part on his sales of Ontak for non-FDA approved uses.

15.    Admit that EISAI, INC. based its sales force's compensation in part on their sales of Ontak for non-FDA approved uses.

16.    Admit that EISAI, INC. based its sales force's compensation in whole on their sales of Ontak for non-FDA approved uses.

17.    Admit that EISAI, INC. based Plaintiff's compensation in part on his sales of Ontak for non-FDA approved uses.

18.    Admit that EISAI, INC. based Plaintiff's compensation in whole on his sales of Ontak for non-FDA approved uses.

19.    Admit that EISAI, INC. provided its sales force with materials designed to market Ontak for non-FDA approved uses.

20.    Admit that EISAI, INC. provided Plaintiff with materials designed to market Ontak for non-FDA approved uses.

21.    Admit that EISAI, INC. engaged physicians to perform research on the use of Ontak for non-FDA approved uses.

22.    Admit that EISAI, INC. awarded grants to physicians to perform research on the use of Ontak for non-FDA approved uses.

23.    Admit that EISAI, INC. provided funding to physicians to perform research on the use of Ontak for non-FDA approved uses.

24.    Admit that EISAI, INC. provided medical studies on the use of Ontak for non-FDA

approved uses to its sales force to utilize in marketing Ontak for non-FDA approved uses.

25.    Admit that EISAI, INC. provided medical studies on the use of Ontak for non-FDA approved uses to Plaintiff to utilize in marketing Ontak for non-FDA approved uses.

26.    Admit that EISAI, INC. provided medical studies on the use of Ontak for non-FDA approved uses to its sales force to utilize in advertising Ontak for non-FDA approved uses.

27.    Admit that EISAI, INC. provided medical studies on the use of Ontak for non-FDA approved uses to Plaintiff to utilize in advertising Ontak for non-FDA approved uses.

28.    Admit that EISAI, INC. rewarded its sales force for the sale of Ontak for non-FDA approved uses with vacations.

29.    Admit that EISAI, INC. rewarded its sales force for the sale of Ontak for non-FDA approved uses with trips to resorts.

30.    Admit that EISASI, INC. promoted the sale of Ontak for non-FDA approved uses by "marketing the spread."

31.    Admit that "marketing the spread" meant advertising or marketing the difference between the discounted price for Ontak and what could be charged to third party payors for reimbursement for non-FDA approved usage of Ontak.

32.    Admit that the "third party payors" referenced in Request Number 31 included insurance companies.

33.    Admit that the "third party payors" referenced in Request Number 31 included Medicare.

34.    Admit that the "third party payors" reference in Request Number 31 included Medicaid.

35.    Admit that EISAI, INC. taught its sales force to "market the spread" in order to sell Ontak even for non-FDA approved uses.

36.    Admit that EISAI, INC. encouraged its sales force to "market the spread" in order to sell Ontak even for non-FDA approved uses.

37.    Admit that EISAI, INC. taught Plaintiff to "market the spread" in order to sell Ontak even for non-FDA approved uses.

38.    Admit that EISAI, INC. encouraged Plaintiff to "market the spread" in order to sell Ontak even for non-FDA approved uses.

39.    Admit that EISAI, INC. requested Plaintiff's help to teach other sales persons how to market Ontak for non-FDA approved uses.

40.    Admit that EISAI, INC. requested Plaintiff's help to teach other sales persons how to advertise Ontak for non-approved uses.

41.    Admit that EISAI, INC. evaluated the performance of its sales representatives based on their prior year's sales.

42.    Admit that EISAI, INC. evaluated the performance of Plaintiff based on his prior year's sales.

43.    Admit that EISAI, INC's sales representatives could not meet their sales goals unless they sold Ontak for non-FDA approved uses.

44.    Admit that Plaintiff could not meet his sales goals unless he sold Ontak for non-FDA approved uses.

45.    Admit that Plaintiff complained to EISAI, INC. management about the sale of Ontak for non-FDA approved uses.

5

46. Admit that Plaintiff objected to the sale of Ontak for non-FDA approved uses to EISAI, INC. management personnel.

47. Admit that Plaintiff warned other EISAI, INC. sales persons regarding the sale of Ontak for non-FDA approved uses.

48. Admit that EISAI, INC. was aware that Plaintiff warned other EISAI, INC. sales persons regarding the sale of Ontak for non-FDA approved uses.

49. Admit that other sales representatives complained to EISAI, INC. management about the sale of Ontak for non-FDA approved uses.

50. Admit that sales representatives other than Plaintiff objected to the sale of Ontak for non-FDA approved uses to EISAI, INC. management personnel.

51. Admit that Keith Woods directed Randy Lawson to give Plaintiff a negative report on a ride-along in or about April 2009.

52. Admit that Keith Woods told Plaintiff that Plaintiff was not a "team player."

53. Admit that Keith Woods told Plaintiff that Plaintiff did not live the "EISAI values."

54. Admit that Keith Woods directed Randy Lawson to give Plaintiff a negative report on a ride-along in or about April 2009 because Plaintiff objected to EISAI, INC.'s sale of Ontak for non-FDA approved use.

55. Admit that Keith Woods told Plaintiff that Plaintiff was not a "team player" because Plaintiff objected to EISAI, INC.'s sale of Ontak for non-FDA approved use.

56. Admit that Keith Woods told Plaintiff that Plaintiff did not live the "EISAI values" because Plaintiff objected to EISAI, INC.'s sale of Ontak for non-FDA approved use.

57. Admit that EISAI, INC. terminated Plaintiff's employment because Plaintiff

6

objected to EISAI, INC.'s sale of Ontak for non-FDA approved use.

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that the foregoing Requests for Admissions were served upon Defendant's Registered Agent, Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301, along with the Complaint and Summons.

Respectfully submitted,

SUSAN L. DOLIN, P.A.
9000 Sheridan Street
Suite 93
Pembroke Pines, FL 33024
Tel.: 954-862-2284
Fax: 954-862-2287
Email: sdolin@dolinlawgroup.com

By: _____

SUSAN L. DOLIN, ESQ., BCS
FBN: 708690

7